GEORGE A. MARTIN *vs.* MAINE CENTRAL RAILROAD COMPANY.

Hancock.    Opinion October 10, 1890.

*Adverse Possession.   Oral Exchange of Lands.   Title.   Estoppel.   R. S., c. 105, § 10.*

Title by possession will become absolute after twenty years of open, notorious and exclusive occupation as owner, under a claim of right or color of title, whether such claim was originally based on a written or parol contract, or no contract at all.

An oral agreement for the exchange of lands, followed by an occupation thereunder, which has all the elements of adverse possession, will ripen into an absolute title, although mutual deeds were never given.

Where the plaintiff, with such a possessory title, knew and approved of a deed, given by one holding the record title, conveying a right to enter the premises, together with a perpetual easement of water and water-rights therein,— himself receiving the consideration named in the deed,— and afterwards saw the defendant, a subsequent grantee, expending large sums of money in improving the easement, but gave no warning to the defendant to desist and made no assertion of title until the completion of the work, and in which he was employed;   *Held*: that he was equitably estopped from asserting any title to the disturbance of the defendant's easement.

ON MOTION.

This was an action for the diversion, &c., of the water, &c., from the plaintiff's land.   The writ is dated August 24, 1888. The defendant company pleaded the general issue; and alleged in its brief statement that the plaintiff was estopped by his acts, his deed, and by his silence in not denying the defendants' title on the premises at the time of the alleged trespass.

The verdict was for the plaintiff.   The defendants, thereupon, filed a general motion for a new trial.

The facts are sufficiently stated in the opinion.

*J. R. Mason, F. H. Clergue,* with him, for defendants.

Plaintiff estopped by deed.    After some acts of alleged trespasses, and before suit, he procured and accepted a warranty deed from heirs of Dudley Martin, February 20, 1885, who held the record title, except so far as Dudley had previously conveyed to Frenchman's Bay Steamboat Co., the defendants' grantor.    Plaintiff estopped from denying the seizin of his grantor.    *Hains* v. *Gardner*, 10 Maine, 383.    Estoppel *in pais*: *Dixfield* v. *Newton*, 41 Maine, 221; *Wilton* v. *Harwood*, 23 *Id.* 131; *Matthews* v. *Light*, 32 *Id.* 305.

*G. P. Dutton*, for plaintiff.

Plaintiff says the premises are his by adverse possession; the license he gave to Walton a personal, parol license, not assignable, and limited to the Steamer Electa; that Dudley Martin's deed to Walton, in terms, does not cover the *locus*, and the *locus* was not his to convey; that he is not estopped by that deed because he never knew of it, and he never authorized or acquiesced in it; that he has not acquiesced but protested from the beginning of the trespass and, has been damaged by the diversion of the water, &c.

WHITEHOUSE, J.    Motion to set a side a verdict for the plaintiff in an action for making excavations, laying pipes and diverting water from springs on the plaintiff's land.

The plaintiff claims title by adverse possession.    The defendant contends that the acts complained of were performed in the enjoyment of a private easement acquired by deed of August 23, 1883, from Dudley Martin, the plaintiff's uncle, to the Frenchman's Bay Steamboat Line and a deed from that company to the defendant of November 25, 1883; and further says that the former deed was executed under circumstances which constitute an equitable estoppel on the plaintiff.

I.    With respect to the claim of adverse possession the testimony was uncontradicted.    The plaintiff's father, John Martin, and uncle, Dudley Martin, owned adjoining farms.    In 1843, the *locus* known as the "lower field" was a part of Dudley Martin's farm under a valid record title.    But in that year there was an oral agreement for an exchange of lots between the brothers whereby the "lower field" in question was to become the property of John Martin.    In pursuance of this agreement John Martin entered into actual possession of the "lower field" and thereafter continued to occupy it without interruption, as a part of his own farm, until his decease in 1871.    Mutual deeds were never executed, but some years after the exchange, Dudley Martin sold the lot received by him, and it is said that John Martin then gave a deed of it.    After the decease of the latter, the plaintiff succeeded him in the exclusive occupation of the homestead, including the *locus*, under an oral arrangement with

the widow and two sisters that he should have the farm for taking care of his mother. Dudley Martin died in the latter part of 1883, and February 20, 1885, the plaintiff obtained from his heirs a warranty deed of the "lower field."

Some of the abstruse doctrines and curious subtleties and refinements of the early common law respecting disseizin are now, in the language of Mr. Stephen, "like exploded shells, buried under the ruins which they have made." In the famous case of *Taylor* v. *Horde*, 1 Burr. 60, Lord Mansfield, observed : "The more we read, unless we are very careful to distinguish, the more we shall be confounded." But "notwithstanding this remark," says Judge Story, "what constitutes disseizin is, at least in this country, well settled." *Prescott* v. *Nevens*, 4 Mason, 329. And it is believed that the law applicable to the facts of this case is not uncertain or difficult to be understood under the statute and decisions of this state. "To constitute disseizin or such exclusive and adverse possession of lands as to bar or limit the right of the true owner thereof to recover them, such lands need not be surrounded with fences ; . . . but it is sufficient if the possession, occupation and improvement are open, notorious and comporting with the ordinary management of a farm." R. S., c. 105, § 10. It was obviously not the design of this enactment, however, to make such occupancy conclusive, but only presumptive evidence of disseizin. If the occupancy is "satisfactorily indicative of such exercise of owner-ship as is usual in the improvement of a farm *by its owner*," (original act, 1821, c. 62, § 6), it will be sufficient evidence of adverse possession in the absence of controlling evidence to the contrary. It must appear as a fact that the possession is adverse and not under a tenancy or otherwise in subordination to the title of the true owner. *Worcester* v. *Lord*, 56 Maine, 265. But the word "adverse" does not necessarily imply any wrong-ful act or intent in effecting the entry or actual hostility in maintaining possession as against the true owner. Bracton's familiar antithesis, "*omnis disseisina est transgressio, sed non omnis transgressio est disseisina*," is now no better law than Latin. It is misleading. But his further statement ; " *Quaeren-dum est a judice quo animo hoc fecerit*," is still an apt direction.

Co. Litt. 153, *b* ; 8 Mod. Rep. 55.   The intention guides the entry and fixes its character.   It may be immaterial whether the occupant obtains his seizin as a purchaser or a trespasser. *Jewett* v. *Hussey*, 70 Maine, p. 435. His title will become absolute after twenty years of open, notorious and exclusive occupation as owner, under a claim of right or color of title, whether such claim was originally based on a written or parol contract or no contract at all.   *Sch. Dist.* v. *Benson*, 31 Maine, 381 ; *Moore* v. *Moore*, 61 Maine, 417 ; Tyler on Ad. Enjoyment, 851 *et seq.* ; Buswell on Lim. and Ad. Poss. 264.   So if a son enters upon land under a parol gift thereof from his father and has the sole and exclusive possession for twenty years under a claim of ownership he thereby acquires title.   *Sumner* v. *Stevens*, 6 Met. 337.   In the opinion, Ch. J. Shaw, says : "a grant, sale or gift of land by parol is void by the statute.   But when accompanied by an actual entry and possession, it manifests the intent of the donee to enter and take as owner and not as tenant ; and it equally proves an admission on the part of the donor that the possession is so taken.   Such possession is adverse." See also *Abbott* v. *Abbott*, 51 Maine, 575 ; *Webster* v. *Holland*, 58 Maine, 168 ; *Hitchings* v. *Morrison*, 72 Maine, 331 ; *Ricker* v. *Hibbard*, 73 Maine, 105.

If, therefore, the jury believed the evidence of the plaintiff on this point, they were authorized to find that the occupation of the plaintiff's father, having all the elements of adverse possession, ripened into a title during his life time. At his decease, the plaintiff became legally a tenant in common with the other heirs ; in fact, however, he had the sole and exclusive possession under the arrangement stated.

II.   But if it be assumed that the plaintiff's title was such as to authorize the maintenance of this action, as the pleadings stood, (R. S., ch. 95, § 19 ; *Hobbs* v. *Hatch*, 48 Maine, 55,) a more serious obstacle presents itself arising from the plaintiff's conduct respecting the deed of the easement from Dudley Martin, and his subsequent acquiescence in the defendants' operations on the land.   It is earnestly contended that the plaintiff is equitably debarred from setting up any claim against the defendants inconsistent with that conduct.

Estoppels were formerly characterized as odious and not to be favored in the law. And it must be admitted that the definition of Lord Coke, was well designed to suggest a technical and arbitrary rule of evidence merely. The name "estoppel," was given, he said, "because a man's own act stoppeth up his mouth to allege or plead the truth." Co. Litt. 352, a. n. 1. But the equitable estoppel of to-day is essentially and widely different from the legal estoppel *in pais* of Lord Coke. "Equitable estoppel in the modern sense arises from the *conduct* of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything." Pom. Eq. § 802. Legal estoppels exclude evidence of the truth and the equity of the particular case to support a strict rule of law on grounds of public policy. Equitable estoppels are admitted on exactly the opposite ground of promoting the equity and justice of the individual case by preventing a party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove the truth. *Horn* v. *Cole*, 51 N. H. 287. Though pre-eminently a creature of equity, the doctrine has been incorporated into the law, and there is now an increasing tendency to apply it in the decision of legal controversies in courts of law. *Kirk* v. *Hamilton*, 102 U. S. 68. It is no longer regarded as merely a technical rule of evidence, but a part of the substantive law which regulates rights and duties. It is "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." Pom. Eq. § 804. Mr. Stephen's definition contains the rule laid down in the leading English case of *Pickard* v. *Sears*, 6 Ad. and E. 469, as interpreted and limited in *Freeman* v. *Cook*, 6 Bing. 174. See Stephen's Dig. of Ev. Art. 102 ; Bigelow on Estoppel, 483 – 485.

It is now familiar law that the owner of real or personal property may, by his conduct in inducing others to deal with it without informing them of his claim, debar himself from asserting his title to their injury. "No principle," says Chancellor Kent, in *Wendell* v. *Van Rensalaer*, 1 Johns. Ch. 344, "is better established or founded on more solid considerations of equity and public utility than that which declares that if one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice and his conscience is bound by this equitable estoppel." But it is not necessary that the original conduct creating the estoppel should be characterized by an actual intention to mislead and deceive. This principle is well illustrated in the important case of *Storrs* v. *Barker*, 6 Johns. Ch. 166, (10 Am. Dec. 316). The defendant claimed to enforce his title as heir at law of his daughter, and the plaintiff claimed under a devise from the daughter which proved void in law. In the opinion, Ch. Kent, says: "Here then, is the case of a defendant knowing and approving at the time of his daughter's devise of real estate to her husband, and of that husband's retaining possession for a year after her death, and then selling the land to a third person with the advice of the defendant. He afterwards permitted that buyer to make improvements and exercise acts of ownership upon the land for the space of three years. If the case rested on these facts alone, it would fall within the rule in equity that, when one having title acquiesces knowingly and freely in the disposition of his property for a valuable consideration by a person pretending to title and having color of title, he shall be bound by that disposition, and especially if he encouraged the parties to deal with each other in such sale and purchase. But the defendant claims that he mistook the law of the land, and for three years did not know that his title was good and that the devise was void. The presumption is that every person is acquainted with his own rights, provided he has had reasonable opportunity to know

them ; and nothing can be more liable to abuse than to permit a person to reclaim property, in opposition to all the equitable circumstances stated, upon the mere pretense that he was at the time ignorant of his title." See also Pom. Eq. § 805, and authorities cited ; *Dixfield* v. *Newton*, 41 Maine, 221 ; *Cady* v. *Owen*, 34 Vt. 598.

Thus, while it is well established that the owner of land may by his conduct preclude himself from asserting his legal title, "it is obvious that the doctrine should be carefully and sparingly applied, and only on the disclosure of clear and satisfactory grounds of justice and equity. It is opposed to the letter of the statute of frauds, and it would greatly tend to the insecurity of titles, if they were allowed to be affected by parol evidence. It should appear that there was either actual fraud, or fault or negligence equivalent to fraud on his part in concealing his title, or that he was silent when the circumstances would impel an honest man to speak, or that there was such actual intervention on his part as in *Storrs* v. *Barker*, *supra*." *Trenton Banking Co.* v. *Duncan*, 86 N. Y. 221 ; *Shaw* v. *Beebe*, 35 Vt. 205.

In the case at bar, there is some conflict of testimony in regard to the circumstances under which the deed of the easement from Dudley Martin was executed. Alfred Walton testified for the defendant that as president of the "Frenchman's Bay Steamboat Line," he made a bargain with the plaintiff for the right to take water from the springs as described in the deed, agreeing to pay him ten dollars down and ten dollars at the end of a year if the water proved sufficient ; and give him employment in connection with the water-works. He further testified : "When I came to mention the matter of a deed, he says, 'I cannot give it to you. I don't own the land,— that is I cannot give you a deed of it.' I says, 'Who does own it?' Dudley Martin owned it,— was what he told me. He said he occupied it, but his uncle owned the land. I says, 'Can't we see your uncle and see if he will sell the land for you or transfer it.' He says, 'We will.'" And thereupon according to the testimony of this witness, "the next day or the day after," the deed was executed in the presence and under the immediate direction of the plaintiff. In his testimony

the plaintiff denied that he ever made an oral agreement to the extent asserted, claiming that it was only a license for the company to take water for the Steamer Electa. He also denied that he ever authorized Dudley Martin to execute the deed in question, or that he ever had any knowledge of it whatever until the defendants entered upon the land under its deed. It was admitted, however, that the plaintiff received the two installments of ten dollars each, and payment for his labor, according to the terms of the agreement, in the aggregate "something over fifty dollars," and that he did state to Dr. Walton that his uncle had a deed of the land.

It appears from the report of the plaintiff's evidence that, for thirty years after the exchange of lots as stated, Dudley Martin had never exercised any acts of ownership over the "lower field," but had always spoken of it as "John's field." He knew that the plaintiff succeeded his father in the exclusive occupation of it as his own. And it is highly improbable that Dudley Martin would give a warranty deed of a permanent easement in his nephew's land, unless by his direction or, at least, with his knowledge and approbation. The suggestion that the description in the deed was intended to comprise, not the springs in question, but other springs on land actually owned and occupied by Dudley Martin, is equally without merit. It is improbable that he would convey an easement in his own land for a consideration paid to his nephew. The conclusion is irresistible that the deed was made in accordance with the agreement between the plaintiff and Dr. Walton. This view is corroborated by the plaintiff's conduct after the easement was transferred to the defendants. He had full knowledge of the defendants' operations in digging trenches and laying pipes on the land in 1884, and neither objected to the work nor claimed title to the land. After he had obtained his deed from the heirs of Dudley Martin, in 1885, he labored three weeks in the defendants' employment in the further prosecution of the work of laying pipes and building a catch-basin, and only protested against the construction of a dam, "because the deed gave no such right." He saw large sums of money expended by the defendants to make

the easement available for the purposes for which it was acquired, and neither gave warning to desist, nor made any assertion of title until the completion of the work. He was silent when he ought to have spoken and can not be heard to speak when he ought to be silent.

Nor can negligence justly be imputed to the defendants or its grantor. At the time of the execution of the deed from Dudley Martin all the facts respecting adverse possession, upon which the plaintiff now relies, were peculiarly within his knowledge. It is immaterial that he did not then appreciate their force and significance or apprehend the legal state of the title. He was in the occupation of the land, assumed to make a bargain for the sale of the easement, received the only consideration that was paid for it, and, we cannot doubt, assented to a conveyance of it from one having the record title. The defendants hold under a record title for valuable consideration without notice of the plaintiff's claim.

Under these circumstances, we think the plaintiff is now equitably estopped from asserting any title to the disturbance of the defendants' easement, acquired under the deed from Dudley Martin, and that the verdict is so manifestly against the evidence as to require the intervention of the court.

*Motion sustained.*

PETERS, C. J., LIBBEY, EMERY, FOSTER and HASKELL, JJ., concurred.