James F. MILLIKEN

v.

Ruth BUSWELL and Paul Kennedy.

Supreme Judicial Court of Maine.

Dec. 12, 1973.

Aldrich & Aldrich, by Rupert F. Aldrich, South Paris, for plaintiff.

Grover G. Alexander, Gray, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

On September 12, 1968 the plaintiff brought his complaint to establish his title to a certain parcel of land located on the westerly side of Route #26 in the Town of Oxford, County of Oxford, seeking at the same time incidental damages for the use by the defendants of the triangular portion of the land in dispute.

The defendants pleaded legal title in themselves and, in addition thereto, title by virtue of adverse possession for more than

twenty (20) years. Even though not specifically pleaded as affirmative defenses under Rule 8(c), M.R.C.P.,[1] the issues of estoppel and that the divisional boundary line as claimed by the defendants was agreed to, and acquiesced in, as such by the plaintiff, were treated by the parties and the Justice below as within the scope of the pleadings. Furthermore, the plaintiff does not raise any objection on that score in this appeal. We will dispose of these issues, assuming they are properly before us without intimating what our ruling would be upon proper objection.[2]

The case was heard before a single justice without jury and he found for the plaintiff on all issues and awarded him damages in the amount of $400.00 with costs. The defendants appeal from the judgment, assigning as points on appeal:

"1. The Court erred in permitting the testimony and opinions expressed by the expert witnesses called by the Plaintiff.

"2. The Court erred in permitting the admission of the exhibits (plans) offered by the Plaintiff.

"3. The Judgment is contrary to the greater weight of the evidence.

"4. The Court erred in its application of existing Maine law.

"5. The Court erred in granting Judgment to the Plaintiff."

No question has been raised as to the amount of damages, either in the designated points on appeal or in the defendants' brief. We deny the appeal.

The parties agree that they own adjoining lots bounded on the east by Route #26, which runs in a general northerly direction from Welchville to Norway, Maine. Plaintiff's parcel lies to the north of defendants' land and the parties agree that the instant litigation arose over the course their common divisional line (plaintiff's southern boundary and defendants' northern boundary) should take. There is no serious dispute that the controversial boundary line commences at a point on Route #26 marked by the steering post of a Model T Ford. This monument points out respectively plaintiff's southeast and defendants' northeast corner.

The defendants contend for a boundary line running westerly from Route #26 at an angle of ninety (90°) degrees, while the plaintiff maintains that the angle at which their common boundary line intersects the road is seventy-six degrees and fifty minutes (76° 50′) when viewed from the defendants' parcel or one hundred three degrees and ten minutes (103° 10′) when viewed from the plaintiff's lot.

## I. RECORD TITLE

Both parcels were once part of a larger tract of land belonging to one Amos Smith. On October 26, 1898 Smith's administrator conveyed the entire tract to Frank M. Brown and Wallace W. Brown. Wallace conveyed his interest in the property to his brother, Frank, on March 22, 1911. What is now plaintiff's parcel was first conveyed out of the larger tract, when Brown conveyed to Alva E. Bumpus on October 6, 1932. The land owned by the defendants

---

1. Rule 8(c) "Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, . . . , estoppel, . . . , and any other matter constituting an avoidance or affirmative defense."

2. In relation thereto, we quote from 61 Am.Jur.2d, Pleading, § 407: "Material and vital averments going to the substance of the pleading and constituting an essential element of the cause of action or defense cannot gen-

erally be so [by verdict or judgment] aided." See, cases under note 17. Also, at § 410: "Where a defense must be pleaded specially, the omission to plead it is not cured by the introduction, without objection, of evidence in support of it, and the finding of the facts in relation to it by the court." But see, Humenik v. Siwek, 1963, 266 Minn. 491, 124 N.W. 2d 191; Daniels v. Sanders, 1966, 114 Ga. App. 495, 151 S.E.2d 820; Michner Plating Co. v. Davis Drilling Co., 1968, 10 Mich.App. 358, 159 N.W.2d 366.

was originally conveyed by Brown to one Levi Bixby. Although this deed is unrecorded and the date of its execution and delivery does not appear in the evidence, it is clear, and the defendants do not dispute the fact, the Bixby conveyance took place after the Brown deed to Bumpus, because the first recorded deed of what is now the defendants' parcel describes the land conveyed as beginning at the southeasterly corner of land sold by Frank M. Brown to Alva Bumpus and running in a westerly direction along the southerly line of the Bumpus land.

The plaintiff's deed, as well as all previous deeds in his chain of title, contains the following description:

"a certain lot or parcel of land situated in Oxford, in the County of Oxford and State of Maine, and located on cement road leading from South Paris to Portland [presently Route #26], and *commencing on Northerly corner of lot formerly owned by Amos Smith* and running South 17 rods; thence West 19 rods; thence North 17 rods; thence East 19 rods to the point of beginning." (Emphasis added.)

In an attempt to prove where his land, as described above, would lie on the face of the earth, plaintiff produced two registered land surveyors whose qualifications were not challenged by the defendants. Hugh Hastings, plaintiff's first surveyor, testified that his initial effort was to locate the *northerly corner* of the Amos Smith tract to which plaintiff's deed referred. To do this, he resorted to the earlier deed from Amos Smith to the Brown brothers by which the Browns had come into ownership of the entire larger tract. That deed, in turn, made reference to a stone corner situated on what is presently Route #26. According to the calls in the Smith-to-Brown deed, a line was to run from this stone corner at the road on a course of *south forty-eight degrees west* to another road which the witness identified as the present Skeet Field Road.

The witness examined other deeds of conveyance involving other lots in the general area, besides the plaintiff's deed, and conducted field surveys, all of which led him to conclude that the stone corner mentioned in the Smith-to-Brown deed represented the same northerly corner of the Amos Smith tract referred to in the description of plaintiff's parcel.

To further verify the identity of the stone post, Hastings traced a line from it, "meandered by a fence," until he came to a point on the Skeet Field Road where he found another stone marker. From this second stone marker, he traced another Smith line south along the Skeet Field Road until he came to another point for which he was looking. The tie rod of a Model A automobile marked the latter point and in the opinion of the witness confirmed both the other stone marker on the Skeet Field Road and the identity of the stone post marking the "northerly corner of the lot formerly owned by Amos Smith" and now owned by the plaintiff.

After making several trial runs and plotting a line from the split stone post at plaintiff's northeast corner to the Skeet Field Road, Hastings was of the opinion that the plotted line which ran South 55° 50' West was the same line which in the Smith deed was described as running "south forty-eight degrees west." He explained the discrepancy by attributing it to the declination of magnetic north over the years. Since the description in the plaintiff's deed, as well as the original description in the Brown-to-Bumpus deed, clearly indicated that a parallelogrammatic lot was intended by the parties, Hastings plotted the southern and western lines respectively parallel to the northern and eastern lines. Dana Douglas, the plaintiff's other surveyor, supported Hastings in locating the plaintiff's northerly corner and agreed that the plaintiff's southerly line would run parallel with the plaintiff's northerly line.

On the other hand, the defendants, through their surveyor, whose qualifica-

tions were not disputed, submitted a plan on which the lines of both parcels purported to intersect Route #26 at right angles. Admitting on cross-examination that the lines he drew actually varied from a right angle by two and one half degrees, he testified that he had made no title search in connection with his survey. He further stated that all his work, in establishing the lines of the defendants' parcel on the face of the earth, was done largely from a copy of the defendants' deed; he conceded that he never saw the plaintiff's deed, nor traced the plaintiff's northerly line from Route #26 to the Skeet Field Road, and that he made no adjustment of the lines to compensate for the declination of magnetic north.

The Justice below, in the face of conflicting evidence, concluded that the plaintiff had carried his burden of proof that "his lot boundaries are as depicted on Plaintiff's Ex. #17" as testified to by Mr. Hastings, and in this, we cannot say that he was clearly wrong.

 Indeed, the location of boundaries on the face of the earth is a question of fact. Perkins v. Conary, 1972, Me., 295 A.2d 644; Rusha v. Little, 1973, Me., 309 A.2d 867. And the burden is on the appellant, in a non-jury trial, to satisfy this Court that the findings of fact of a single justice are "clearly erroneous." Rusha v. Little, supra; Perkins v. Conary, supra; Garland v. Vigue, 1967, Me., 236 A.2d 324; Sowles v. Beaumier, 1967, Me., 227 A.2d 473.

The defendants, however, claim clear error of law by the Justice below in accepting the plaintiff's surveyors' plan which was based upon an interpretation of the plaintiff's boundaries in his deed according to the magnetic meridian rather than staying with the literal calls which described the lines as running respectively south, west, north and east. They argue that the deed required the courses to be determined by the "true" meridian, i. e. by the sidereal or astronomical meridian and not by the magnetic meridian.

True, this Court has ruled that what are the boundaries is a question of law. Perkins v. Conary, supra; Rusha v. Little, supra.

 But, in identifying descriptions in deeds, the use of the words *north or northerly, east or easterly, south or southerly, west or westerly* does not always indicate a direction that is due north, east, south or west. Cilley v. Limerock Railroad Company, 1910, 107 Me. 117, 77 A. 776; Brown v. McCaffrey, 1948, 143 Me. 221, 60 A.2d 792.

In M'Iver's Lessee v. Walker, 1815, 9 Cranch 173, 13 U.S. 173, 3 L.Ed. 694, Mr. Chief Justice Marshall said:

"It is, undoubtedly, the practice of surveyors, and the practice was proved in this cause [the surveyors in the instant case confirmed the practice], to express in their plats and certificates of survey, the courses which are designated by the needle; and if nothing exists to control the call for course and distance, the land must be bounded by the courses and distances of the patent, according to the magnetic meridian."

 We need not presently decide whether in the construction of deeds the use of magnetic north instead of "true" north is to be presumed as the New Hampshire Court ruled in Wells v. Jackson Iron Manufacturing Company, 1866, 47 N.H. 235. But, in weighing evidence of recent surveys of ancient lines, consideration must be given to the variation of the needle in determining a magnetic course. Brooks v. Tyler, 1829, 2 Vt. 348.

 In the present case, there was ample evidence to support the Justice's factual finding that the "compass bearings pertinent to the issues here represent magnetic meridian as opposed to true north." Both

surveyors testified as unlikely the use of "true" north as the basis of the ancient survey to which the original deed referred. Indeed, the use of "true" north here would necessitate a change in the location of Route #26 which otherwise would run through the parcels in question, contrary to the position of the parties who agree that their respective lots are bounded on the east by the road.

 Defendants' argument that the calls in their deed for lines running at right angles to Route #26 should prevail is unwarranted. The earliest deed description of their land contained no right angle reference, but rather bounded the land by the southerly line of the parcel now owned by the plaintiff. When a deed describes the land conveyed in terms of reference to an adjoining tract, the boundary line of the adjoining tract referred to become a monument to which *courses*, distances and quantity must yield. Perkins v. Conary, supra; Rusha v. Little, supra.

The defendants further argue that the Justice below erred as a matter of law in admitting in evidence both plaintiff's surveyors' opinions and plans over their objections. This claim of error is grounded on the fact that, in arriving at their conclusions, the surveyors had relied on hearsay. True, in his direct testimony, Hastings testified:

> "This is the County Road from Norway to Welchville running northerly and southerly. This corner [obviously pointing] is on the west side of this road and is represented by an old split stone post. This is described in the deed—the deed I mentioned, *and is also known by the adjoining owners to be their common corner.*" (Emphasis supplied.)

It is at this point that the defendants' counsel objected and the Court then instructed the witness "[n]ot what it is known as by the adjoining owners." Further colloquy between the Court and the witness ran as follows:

"Q. (By the Court): Did you say that was a split stone—

"A. Monument. I talked with Mrs. Miner; she claimed it to be—

"The Court. No. Just what you found; just what this represents from deeds.

"The Witness: O. K. You want me to stick strictly to the deeds.

"The Court: Yes. No conversation with any party."

It is apparent that the Justice below, hearing this case in the absence of a jury, by his conduct indicated that he was to give effect to defendants' objections and would disregard that part of the testimony to which objection was being made.

But the defendants' counsel brought the hearsay back into the evidence when the following colloquy he had with the witness took place:

"Q. So, you selected this northeast corner because, as you said earlier, you assumed that was it or it seemed to be a common point because somebody said so; isn't that right?

"A. It checked with my other work.

"Q. Excuse me. We are talking about the point of beginning now.

"A. Yes.

"Q. You just arbitrarily selected that because somebody told you or you felt or assumed that was the common corner and you started from there; is that correct?

"A. I had many reasons why I started at that point.

"Q. Please don't be evasive, Mr. Hastings. If what I am asking is correct, I wish you would say so.

"The Court: If he can testify as to why he started there, that is what we are trying to find out.

"A. I started at the stone post depicted on this plan as the northeast corner because by the title search it was the common corner between the Milliken lot and Miner lot and both Milliken and Miner told me it was their common corner, and Ryan also knew that his line was a prolongation of Milliken's line.

"Q. (By defendants' counsel) : You are relying on something that someone told you; is that correct?

"A. That is true, together with the fact that I had a great deal of title work that pinpointed me to this area as the point of beginning so that I knew I was very close to it."

■ As we said in Warren v. Waterville Urban Renewal Authority, 1967, Me., 235 A.2d 295 :

"The opinion of an expert is not necessarily rendered inadmissible or incompetent because it may be based on knowledge of facts gained from hearsay sources. Any expert worthy of the name must of necessity assimilate prior learning derived from the experiences of others. As an expert witness he draws upon various sources of information whose credibility or trustworthiness he must determine in the light of his expertness. It would completely frustrate the use of expert witnesses if they were obliged to substantiate each single factor upon which their ultimate opinion must depend upon firsthand personal knowledge or personal experience. If some of the expert's factual information is derived from sources fairly trustworthy though hearsay and he has as such the ability to co-ordinate and evaluate that information with all the other facts in his possession secured through personal observation, the trial court may in the exercise of a sound discretion permit the expert's ultimate opinion to be considered by the jury [the factfinder]."

■ The defendants' counsel was within his rights in cross-examination to bring out before the factfinder some of the hearsay sources tapped by the surveyors to support their ultimate opinion, but, having done so, he cannot now complain about the hearsay, provided their ultimate conclusion was actually based on their own independent investigation and calculations. The Justice below was so satisfied, since he characterized their testimony as "impressive and convincing," and "ever so convincing." The weight to be given to the opinions of the surveyors was for the single Justice. Sowles v. Beaumier, supra; Perkins v. Conary, supra.

## II. ADVERSE POSSESSION

■ In order to prove title by adverse possession, the party so claiming must carry the burden of proof by the fair preponderance of the evidence that his possession of the premises was "actual, open, notorious, hostile, under claim of right, continuous, and exclusive for a period of at least twenty years." Hibbard v. Fromkin Woolen Corp., 1960, 156 Me. 433, 435, 165 A.2d 49, 51. The earliest possible claim of adverse possession under the evidence in this record, if any, arose later than 1950 when one John Higgins, a predecessor in title to the defendants, placed a stake in the ground and purported thereby to delineate the right angle line for which the defendants contend. In as much as the instant action was commenced in September, 1968, it is clear that the defendants' contention fails.

## III. BOUNDARY LINE BY AGREEMENT AND ACQUIESCENCE

■ The defendants assert that the rule adopted by this Court in Knowles v. Toothaker, 1870, 58 Me. 172, restated in Proctor v. Libby, 1912, 110 Me. 39, 85 A. 298, is applicable to this case. In *Knowles,* the Court said—

"the rule of law now is, that when, in a deed or grant, a line is described as running from a given point, and this line is

afterwards run out and located, and marked upon the face of the earth by the parties in interest, and is afterwards recognized and acted on as the true line, the line thus actually marked out and acted on is conclusive, and must be adhered to, though it may be subsequently ascertained that it varies from the course given in the deed or grant."

In that case, the Court further stated that acts of the defendant and the plaintiff's predecessor in title "in surveying and marking the line in dispute upon the face of the earth by stakes and stones and spotted trees, building a fence thereon, *intending it to be the line between them,* and occupying up to it, make and establish such line as the divisional line between the two lots." (Emphasis ours.)

The evidence in relation to this aspect of the case was conflicting. The plaintiff testified that he never discussed the location of the line with anyone and was always uncertain as to its true location. He was supported in this by several of the defendants' predecessors in title, and by the defendant Buswell herself who also conceded that she never discussed the line with the plaintiff. The clearance of trees to the right angle line was an equivocal act at best.

In Proctor, the Court said:

"Muniments of title are not to be lightly set aside, and testimony to overcome a record line should be full, clear, and convincing, and should be scanned with care and caution."

The Justice below found specifically that there was no agreement fixing a boundary line and we cannot say that he was clearly wrong in doing so. See, Bemis v. Bradley, 1927, 126 Me. 462, 139 A. 593.

## IV. ESTOPPEL

Finally, the defendants argue that the plaintiff is estopped from asserting his title to the locus in dispute, for the reason that the defendants' dwelling was moved sometime past from its former location to its present site partly on the record boundary line at the plaintiff's suggestion and expense. The evidence concerning the movement of the building is inconclusive. A reading of the record shows that the change in location was of mutual interest to both adjoining owners as the testimony of the plaintiff accepted by the Justice below would indicate:

"Q. What was that conversation about with Mr. Record [a predecessor in title of the defendants]?

"A. He came over to my place and said he was going to put in a bathroom, jack his building up. And I suggested that if he would move it back the length of it I would jack it up for him and leave it jacked up; and he agreed to it.

"Q. You say Mr. Record came to you?

"A. He was over visiting at my place.

"Q. And he said that he was going to what, put a bathroom in?

"A. Yes.

"Q. And then what was said?

"A. His buildings obstructed the view of northbound traffic on 26 from observing my place, and I suggested that if he would let me move the building back the length of it, that I would leave it jacked up so he could put in his foundation and have his bathroom without any cost.

"Q. So that the reason for moving the building back was for traffic on 26 to get a view of your business operation there?

"A. That's right.

"Q. And this was for your benefit; is that correct?

"A. I would say so.

"Q. And did Mr. Record make any charge to you of any kind for doing this?

"A. No, sir.

"Q. Now at that time did you discuss with him anything about the lines?

"A. No, sir.

"Q. You didn't consider, then, that by moving the building back you might possibly be setting it on the boundary line between the two of you?

"A. No, sir.

"Q. Did you think about that?

"A. No, sir.

The evidence in no way suggests that the plaintiff personally directed the movement of the building, nor that he selected its present emplacement. What positively appears is that the placing of the structure in its present location was no part of any attempt by the adjoining owners to locate a boundary line, let alone knowingly to establish one. The Justice below could justifiably conclude that the plaintiff merely reimbursed the defendants' predecessor in title for his removal of the building from its previous site which interfered with the view of the plaintiff's business premises from the highway.

■■■■ An owner is precluded under the doctrine of estoppel on the grounds of justice and equity from asserting his legal title when, by his own conduct, declarations or inaction made to or taking place in the presence of another and having a natural tendency of influencing that other's conduct, he has caused such other person to act or alter his position to his detriment. It is not necessary that the conduct creating the estoppel should involve an actual intention to mislead and deceive. If he remains silent when it is his duty to speak, as where inquiries are made of him, or if, instead of merely remaining silent, he does some positive affirmative act, even if it be mere encouragement, he subjects himself to the application of the doctrine of equitable estoppel, if such silence or active conduct would naturally have the effect of misleading or deceiving and did so, notwithstanding the fact that the truth concerning the true facts could have been ascertained by an examination of the records. See, Martin v. Maine Central Railroad Company, 1890, 83 Me. 100, 21 A. 740; Rogers v. Portland and Brunswick Street Railway, 1905, 100 Me. 86, 60 A. 713; Thompson v. Gaudette, 1952, 148 Me. 288, 92 A.2d 342.

■■■■ The doctrine of equitable estoppel should be carefully and sparingly applied; it requires clear and satisfactory proof that there was either actual fraud, or fault or negligence equivalent to fraud on the part of the person to be estopped in concealing his title, or that he was silent when the circumstances would impel an honest man to speak, or that there was misleading active conduct of encouragement or intervention. See, Martin v. Maine Central Railroad Company, supra.

■■■■ In the instant case, we cannot say that the single Justice was clearly wrong in rejecting the defendants' claim of estoppel.

The entry will be

Appeal denied.

WEBBER, J., sat at argument, but retired before this opinion was adopted.

All Justices concurring.