1998 ME 53

**CHRYSLER CREDIT CORPORATION**

v.

**BERT COTE'S L/A AUTO SALES, INC. and Auto Park Associates, et al.**

Supreme Judicial Court of Maine.

Argued Dec. 3, 1997.
Decided March 11, 1998.

Timothy H. Norton (orally), U. Charles Remmel, Kelly, Remmel & Zimmerman, Portland, for plaintiff.

Jeffrey T. Edwards (orally), Bruce C. Gerrity, Carl W. Tourigny, Preti, Flaherty, Beliveau & Pachios, L.L.C., Portland, for defendants.

Before ROBERTS, CLIFFORD, RUDMAN, DANA, LIPEZ, and SAUFLEY, JJ.

RUDMAN, Justice.

[¶ 1]   Chrysler Credit Corporation (CCC) appeals from the judgments entered in the Superior Court (Androscoggin County, *Cole, C.J.*) finding that CCC had breached its commitment to provide financing to Bert Cote's L/A Auto Sales ("L/A Auto Sales") and to Bert's Subaru, Inc. ("Bert's Subaru"); that CCC's failure to provide financing to L/A Auto Sales was in violation of the Maine Dealers Act, 10 M.R.S.A. §§ 1171–1186 (1997 & Supp.1997); that CCC had intentionally interfered with L/A Auto Sales' and Bert's Subaru's contractual relations; and that L/A Auto Sales' guarantors were liable in the amount of $189,000 for L/A Auto Sales' breach of its loan agreements with CCC.[1] CCC makes numerous arguments on appeal, including, *inter alia,* that the court exceeded the bounds of its discretion by granting L/A Auto Sales' motion to amend its complaint to add Bert's Subaru as a plaintiff after L/A Auto Sales had rested its case; that the court exceeded the bounds of its discretion by allowing a witness who had not been designated as an expert to testify regarding Bert's Subaru's estimated lost profits; and that the court erred by instructing the jury that CCC could be equitably estopped from enforcing its loan agreements. We agree with CCC's contentions and vacate the judgments in favor of L/A Auto Sales and Bert's Subaru and the judgment in favor of CCC against L/A Auto Sales' guarantors.[2]

---

**1.** Separate *actions* by CCC and L/A Auto Sales were consolidated for trial.

**2.** Because we vacate the judgments on the basis of CCC's first three contentions, we do not reach its other contentions on appeal, nor do we have occasion to consider the issues raised by L/A Auto Sales and Bert's Subaru in their cross-appeal.

## I.

[¶ 2]  L/A Auto Sales,[3] a Lewiston automobile dealership selling mainly Jeep/Eagle vehicles, was established in 1987 by Bertrand Cote and five minority stockholders.[4]  It leased its place of business on Lisbon Street from Auto Park Associates, a real estate partnership whose partners were L/A Auto Sales' six stockholders and a seventh individual.

[¶ 3]  In order to finance its inventory of vehicles, L/A Auto Sales entered into a floorplan credit agreement with CCC in 1987. Pursuant to the floorplan credit agreement, CCC agreed to advance funds to L/A Auto Sales to finance the acquisition of vehicles, and L/A Auto Sales agreed to promptly remit the proceeds from each sold vehicle to CCC. The floorplan line of credit was secured by a first security interest in the financed vehicles and in L/A Auto Sales' business assets, and was personally guaranteed by L/A Auto Sales' six stockholders.  In addition to providing the floorplan line of credit, CCC also loaned L/A Auto Sales approximately $161,000 for the purchase of various fixed assets.

[¶ 4]  Within a year after it commenced operations, L/A Auto Sales encountered financial difficulties.  By late 1988 it began to report monthly operating losses and floorplan borrowings in excess of one million dollars, resulting in tightened cash flow, increased leverage, and a bloated inventory of vehicles.  According to Bert Cote, L/A Auto Sales' majority shareholder, CCC contributed to the dealership's financial problems by allowing it to overborrow on the floorplan line.  By late summer 1989 L/A Auto Sales had breached the CCC floorplan agreement by failing to remit to CCC vehicle sale proceeds totalling $189,000, keeping the funds instead to cover daily operating expenses. As a result of this "out-of-trust" situation, CCC put L/A Auto Sales on involuntary finance hold, meaning that no more vehicles would be shipped and no additional funds would be advanced.  L/A Auto Sales' out-of-trust amount continued to grow during the ensuing months, eventually reaching $308,000 by October 1990.

[¶ 5]  As L/A Auto Sales continued to struggle financially, Bert Cote became interested in adding a Subaru franchise to the existing business.  Hoping that the economic efficiencies of operating two franchises, Jeep/Eagle and Subaru, at the Lisbon Street location would improve profitability, in mid-1989 he applied for a Subaru franchise. Henry Burbank, a vice president of marketing for Subaru New England, reviewed Cote's application and in August 1989 approved the application, subject to several conditions, including the provision of adequate facilities and the acquisition of a one million dollar floorplan credit line.  In anticipation of the Subaru dealership, Cote incorporated a new entity called "Bert's Subaru, Inc.," whose stock would be 100% owned by Cote.

[¶ 6]  On December 15, 1989, Fleet Bank issued a commitment letter to Auto Park Associates, the real estate partnership, promising to lend it $600,000.  Pursuant to the commitment letter, $300,000 of the total loan was to be used to renovate the Lisbon Street building to house the proposed Subaru dealership, and $200,000 of the total loan was to be injected as capital into L/A Auto Sales and the proposed Subaru dealership.  The loan would be due in three years, and would be secured by, inter alia, a second mortgage on Auto Park Associate's Lisbon Street property and a $350,000 cash collateral pledge.

[¶ 7]  According to Cote's testimony at trial, he called CCC representative Charles Fahey on December 15 to discuss the Fleet proposal.  Fahey requested that Cote send him expense projections, which would enable Fahey to determine whether CCC was interested in making its own financing proposal. Cote sent Fahey the requested information. On January 23, 1990, Cote telephoned Fahey and asked whether he should accept Fleet's proposal.  According to Cote, Fahey told him not to sign the commitment letter, and that CCC "would come up with a better finance

---

**3.**  Bertrand Cote's L/A Auto Sales, Inc. was originally incorporated as "Bert Cote's AMC/Jeep/Renault, Inc." Its name was changed in June 1989.

**4.**  L/A Auto Sales' minority stockholders were John Haynes, Jerome Millett, Daniel Thompson, Raymond Lombard, and Alan Ramsdell.

package." There was no further discussion with respect to the amount or term of the loan, the borrowing entity, the collateral, or the interest rate. On the basis of this conversation, Cote testified he declined the Fleet proposal.

[¶ 8] The already strained relationship between CCC and L/A Auto Sales deteriorated further after January 1990. According to Cote, a CCC representative repeatedly disrupted L/A Auto Sales' operations by entering the dealership several times a week to collect the proceeds from vehicles sold, harassing its customers, and treating its employees abusively. Despite frequent audits by CCC, L/A Auto Sales' out-of-trust amount continued to grow as the dealership used the proceeds from vehicles sold to fund payroll and daily operating expenses. Floorplan indebtedness approached one million dollars, and the business continued to report losses each month. Cote testified at trial that he asked Fahey numerous times about CCC's financing proposal; Fahey allegedly responded that he "was working on it."

[¶ 9] In May 1990, Auto Park Associates executed a partnership guaranty secured by a second mortgage on the Lisbon Street property in favor of CCC to further collateralize L/A Auto Sales' outstanding indebtedness, allegedly in exchange for CCC's promise to provide financing for the proposed Subaru dealership and to refinance L/A Auto Sales' out-of-trust amount.[5] Shortly thereafter, Fahey notified Cote that CCC was unwilling to provide further financing for any purpose, and demanded that L/A Auto Sales cure its floorplan defaults. L/A Auto Sales remained out-of-trust, and in October 1990 ceased operations.

[¶ 10] After liquidating its collateral, CCC filed suit against Auto Park Associates, pursuant to the May 1990 secured partnership guaranty, and the individual guarantors, pursuant to their 1987 guaranties, to recover approximately $1.15 million in remaining indebtedness owed by L/A Auto Sales (hereinafter referred to as "the guarantor action"). Auto Park Associates and the individual guarantors filed an answer and a counterclaim, alleging, inter alia, that CCC had breached its commitment to provide financing for the proposed Subaru dealership and to refinance L/A Auto Sales' out-of-trust amount; and that CCC had intentionally interfered with Auto Park Associates' rental relationship with L/A Auto Sales.

[¶ 11] In January 1992, L/A Auto Sales filed its own complaint against CCC (hereinafter referred to as the "L/A Auto Sales action"), in which it alleged, inter alia, that CCC had breached its agreement to refinance its out-of-trust amount and to provide financing for the Subaru franchise (Count 1); that CCC had violated the Maine Dealers Act, 10 M.R.S.A. §§ 1171–1186 (Count 4); and that CCC had intentionally interfered with its car-selling business (Count 5).[6] CCC filed an answer and counterclaim, alleging that L/A Auto Sales had breached the conditions of its loan agreements. The court granted CCC's motion to consolidate the guarantor action and the L/A Auto Sales action.[7]

[¶ 12] At trial L/A Auto Sales was permitted, over CCC's repeated objections, to introduce evidence concerning the projected profitability of the proposed Subaru dealership. This evidence was introduced through the testimony of Henry Burbank, the Subaru New England marketing vice president who had reviewed and conditionally approved Cote's application for a Subaru franchise in August 1989. At the close of L/A Auto Sales' evidence at trial, it moved to amend its complaint to include Bert's Subaru as a plaintiff.

---

5. The court later determined that this partnership guaranty was unenforceable due in part to a lack of consideration. CCC has not appealed the court's determination.

6. L/A Auto Sales' complaint also alleged in Count 2 that CCC had breached an alleged common law duty of good faith and fair dealing, and in Count 3 that CCC had violated the Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1222. Count 3 was dismissed by L/A Auto

Sales at the close of its case-in-chief, and the court granted CCC's motion for judgment as a matter of law on Count 2.

7. In granting CCC's motion to consolidate, the court ordered that the guarantor action remain a non-jury case as originally scheduled, and that the L/A Auto Sales action remain a jury case as originally scheduled.

The court granted L/A Auto Sales' motion over CCC's objection.

[¶ 13]   With respect to the L/A Auto Sales action, the jury returned a verdict finding that CCC was liable to L/A Auto Sales on all three counts in the amount of $250,000; and that CCC was liable to Bert's Subaru, Inc. on the contract and tort counts in the amount of $300,000.   The court entered judgments accordingly.   The jury also determined that L/A Auto Sales had breached its loan agreements with CCC. With respect to the guarantor action, the court adopted the damages determined by the jury in the L/A Auto Sales action, and entered a judgment in favor of CCC in the amount of $189,000.

## II.

■ [¶ 14]   CCC first argues that the court exceeded the bounds of its discretion by allowing L/A Auto Sales to amend its complaint to add Bert's Subaru as a party plaintiff after L/A Auto Sales had concluded its case-in-chief.   When a trial court permits an amendment to the pleadings to add a party, we review this action to determine whether the court exceeded the bounds of its discretion.   *See Mutual Fire Ins. Co. v. Richardson,* 640 A.2d 205, 207 (Me.1994); *Spickler v. York,* 566 A.2d 1385, 1389 (Me. 1989).

■ [¶ 15]   M.R. Civ. P. 15(a) provides that leave to amend should be freely given when justice so requires.   We have construed this mandate to mean that "if the moving party is not acting in bad faith or for delay, the motion will be granted in the absence of undue prejudice."   *Diversified Foods, Inc. v. First Nat'l Bank of Boston,* 605 A.2d 609, 616 (Me.1992) (quoting 1 FIELD, McKUSICK & WROTH, MAINE CIVIL PRACTICE § 15.4; *Bangor Motor Co. v. Chapman,* 452

A.2d 389, 392 (Me.1982)).   When a motion to amend is accompanied by unjustifiable delay that results in prejudice to an opposing party, a court exceeds the bounds of its discretion by granting the motion.   *See Spickler,* 566 A.2d at 1389.

■ [¶ 16]   Pursuant to M.R. Civ. P. 17(a), every action must be prosecuted in the name of the real party in interest.   It is well established that a corporation is a separate legal entity which has the power to sue and be sued in its corporate name.   *See* 13–A M.R.S.A. § 202(1)(B) (1981 & Supp.1997). L/A Auto Sales' majority shareholder, Bertrand Cote, created a new corporation, "Bert's Subaru," in anticipation of the award of the proposed Subaru dealership.   Despite Bert's Subaru's separate legal existence, L/A Auto Sales failed to identify Bert's Subaru as a party in interest during the five years which elapsed between the 1990 commencement of CCC's guarantor action and the conclusion of L/A Auto Sales' case-in-chief at trial.   L/A Auto Sales offers no justification, other than its misapprehension that the two entities would be viewed as one for the purposes of litigation, for this lengthy delay in identifying Bert's Subaru as a plaintiff entitled to its own damages.   Although the passage of time, without more, is not grounds for denying a motion to amend, undue delay removes any presumption in favor of allowing the amendment.   *See Diversified,* 605 A.2d at 616.

■ [¶ 17]   L/A Auto Sales' unjustifiable delay in moving to amend its complaint resulted in unfair prejudice to CCC, as CCC was effectively deprived of the opportunity to prepare a defense to Bert's Subaru's claims.[8] *See Spickler,* 566 A.2d at 1389 (when the court granted plaintiff's motion to amend complaint to add derivative claim at mid-trial,

8.   We reject L/A Auto Sales' contention that because evidence concerning the proposed Subaru dealership was admitted at trial over CCC's repeated objections, CCC was on notice that Bert's Subaru would seek damages.   Bertrand Cote testified that he hoped that combining the existing Jeep/Eagle dealership with a new dealership would result in increased volume and a return to profitability.   Thus, CCC reasonably could have concluded that the Subaru evidence was offered and admitted because it was relevant to estab-

lishing *L/A Auto Sales'* damages.   The fact that Subaru evidence was offered and admitted did not necessarily inform CCC that Bert's Subaru would *itself* seek damages as a party in interest. Moreover, even if CCC suspected that Bert's Subaru would attempt to recover damages, "the fact that defense counsel was alert ... does not excuse the failure of [plaintiff's] counsel to appreciate the necessity of amending the complaint."   *Wilson v. Strong,* 474 A.2d 176, 179 (Me.1984).

defendant was left with no opportunity to prepare defense to derivative claim). Although overlapping, the contract and tort claims of L/A Auto Sales and Bert's Subaru were not interchangeable with respect to either liability or damages. To what extent, for example, did CCC's alleged promise to "come up with a better finance package" pertain to *Bert's Subaru's* financing needs rather than to *L/A Auto Sales'* financing needs? Similarly, to what extent was CCC's alleged tortious conduct directed towards Bert's Subaru's prospective operations rather than towards *L/A Auto Sales'* existing operations? Had Bert's Subaru been identified as a party in interest claiming contract and tort damages in its own behalf, CCC would have had the incentive and the opportunity to explore such distinctions in much greater detail at trial.[9]

[¶ 18] With respect to damages, the differences between L/A Auto Sales and Bert's Subaru, although consistently blurred by L/A Auto Sales in its presentation of evidence, become apparent on close inspection. L/A Auto Sales was an ongoing, active business with an established financial history; Bert's Subaru had yet to commence operations and had no track record. Again, had CCC known that Bert's Subaru intended to seek damages, CCC would have had the incentive and the opportunity to introduce evidence, including perhaps the testimony of an independent expert, designed to show that any prospective lost profits alleged by the contemplated dealership were minimal or unduly speculative. While we recognize the difficulties presented to the trial judge in attempting to sort through the myriad theories and claims which the parties had failed to clarify in advance of trial, we ultimately conclude that the court exceeded the bounds of its discretion by granting L/A Auto Sales' motion to amend its pleadings to add Bert's Subaru as a party in interest at the conclusion of L/A Auto Sales' case-in-chief.

### III.

■ [¶ 19]CCC next contends that the prejudice it suffered as a result of the belated addition of Bert's Subaru as a party in interest was compounded by the court's failure to exclude testimony of the Subaru New England marketing vice president who had reviewed and conditionally approved Bertrand Cote's application for a Subaru franchise. Although the determination of admissibility of testimony, including the testimony of an expert witness, falls within the discretion of the trial court, we will overturn a court's determination for a clear abuse of that discretion. *See Spickler,* 566 A.2d at 1388. When the admission of the testimony of a surprise witness would result in unjustifiable prejudice, a trial court exceeds the bounds of its discretion by failing to exclude that testimony. *See id.* at 1389.

[¶ 20] Burbank, who had not been designated as an expert witness and whose testimony therefore had not been subject to M.R. Civ. P. 26(b)(4)'s discovery requirements,[10] testified over CCC's repeated objections concerning the proposed Subaru dealership's estimated lost profits. He testified, *inter alia,* that he was familiar with the market for Subarus in Maine based on his eighteen years of experience with Subaru New England; that the average annual net profit for Subaru franchises from 1990 to 1994 in Maine was $130,000; that the average annual number of unit sales for Maine Subaru franchises was 284; that based on his knowledge

9. We also note that Subaru New England's approval of the proposed Subaru dealership remained subject to the fulfillment of several significant conditions, including the acquisition of a one million dollar floorplan line of credit and the provision of adequate facilities. Had CCC known that Bert's Subaru would seek damages *as a party plaintiff,* it likely would have placed much greater emphasis on these facts at trial.

10. M.R.Civ.P. 26(b)(4) provides in pertinent part:
   *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivi-

sion (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
   (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion....

of market conditions for Subarus, the Lewiston area would have been an "above average" market; that the long-term future demand for Subarus in the Lewiston area is "excellent"; and that, in retrospect, he believed that Bert's Subaru would have sold between 300 and 400 vehicles per year and would have earned an annual net profit in excess of $300,000.

[¶ 21] L/A Auto Sales contends that Burbank's testimony was not expert in nature, but rather was a permissible lay opinion based on his firsthand review of Cote's application and his personal knowledge of the Maine automobile market. We disagree. Pursuant to M.R. Evid. 701, if a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those which are rationally based on the perception of the witness and which are helpful to a clear understanding of his testimony or the determination of a fact in issue. Thus, although an opinion by a lay witness may be permissible if based on his own perception, such perception must be "adequately grounded on personal knowledge or observation just as would be the case with simple statements of fact." FIELD, & MURRAY, MAINE EVIDENCE § 701.1 (4th ed.1997). If, however, "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." M.R. Evid. 702.

[¶ 22] In this case, it is true that Burbank was personally involved in reviewing and conditionally approving Cote's application for a Subaru dealership. It was Burbank's "knowledge, skill, experience, training, or education" concerning the automobile industry in general and the Maine market for Subarus in particular, however, which enabled him to extrapolate from Cote's application and supporting schedules the opinion that the proposed Subaru dealership would have earned an annual net profit in excess of $300,000.[11]

See M.R. Evid. 702; cf. Ginn v. Penobscot Co., 334 A.2d 874, 883 (Me.1975) (expert opinion unnecessary where "the subject of inquiry is one which is plainly comprehensible by the jury and of such a nature that unskilled persons would be capable of forming correct conclusions respecting it"). Burbank's opinion with respect to the unrealized profits of the proposed dealership derived from his specialized knowledge of the automobile industry, and was not within the realm of the ordinary layperson.

[¶ 23] In the absence of a pre-trial expert designation and Rule 26(b)(4) discovery, CCC had no reason to anticipate that the content of Burbank's testimony would include precise profitability projections developed after the litigation had commenced. Rather, because Burbank had not been designated as an expert witness, CCC reasonably could have concluded that his testimony would be limited to a description of the contemporaneous factual circumstances surrounding Cote's application for a Subaru franchise. Burbank's surprise testimony left CCC with no time to formulate a meaningful cross-examination with respect to the proposed Subaru dealership's lost profits. Similarly, CCC was left with inadequate time to locate its own independent expert to rebut Burbank's testimony on the issue of Bert's Subaru's projected performance. See Spickler, 566 A.2d at 1389 (where defendant was unable to obtain expert to rebut surprise expert witness's testimony, "the jury was left with the impression that, during the nine years before trial, [the defendant] was unable to find a single [expert] who was willing to advance his position"). Moreover, the prejudicial effect of the admission of Burbank's surprise testimony on CCC's defense cannot be dismissed as de minimis. Cf. Turner v. Reed, 606 A.2d 194, 194 (Me.1992) (when surprise expert testimony had no effect on plaintiffs' claim, court did not exceed the bounds of its discretion in admitting the testimony). As the only witness to testify concerning the proposed

11. We intimate no opinion as to whether Burbank's testimony was adequate to enable a jury to calculate the prospective lost profits of this unestablished business. See Marquis v. Farm Family Mut. Ins. Co., 628 A.2d 644, 650–51 (Me.

1993); Eckenrode v. Heritage Management Corp., 480 A.2d 759, 765 (Me.1984); Sheridan Corp. v. Silsby, 410 A.2d 225, 227 (Me.1980); Ginn v. Penobscot Co., 334 A.2d 874, 887 (Me.1975).

dealership's prospective lost profits, Burbank's testimony formed the exclusive basis for the jury's calculation of Bert's Subaru's damages. We conclude that the court's decision to admit Burbank's surprise expert testimony exceeded the bounds of its discretion.

## IV.

[¶ 24] CCC next argues that the trial court erred by instructing the jury that CCC could be equitably estopped from enforcing the terms of its loan agreements with L/A Auto Sales. The court instructed the jury on equitable estoppel as follows:

> Under Maine law, equitable estoppel is an affirmative defense that operates to absolutely preclude a party from asserting contract rights which might perhaps [have] otherwise existed against another person who has in good faith relied upon the [party's] conduct and who has been led thereby to change his position for the worse. It has been emphasized in order for the estoppel defense to be successful, the acts relied upon must have induced the [party's] seeking to enforce an estoppel to do what resulted to his detriment and what would—he would not have otherwise done.
>
> [I]f you find that the Plaintiff changed its position for the worse in detrimental reliance upon misrepresentations and misguided conduct on the part of the Defendant, you may find that Defendant should be estopped from enforcing the terms and conditions of the various loan and financial agreements set forth by the Defendant during the course of the trial or a portion thereof.[12]

The jury determined that L/A Auto Sales had breached its loan agreements with CCC and awarded damages in the amount of only $189,000, notwithstanding CCC's claim that at the time of trial it was owed in excess of $1,000,000. The court entered a judgment in the amount of $189,000.

[¶ 25] In its traditional form, the doctrine of equitable estoppel states that "a party (1) who is guilty of a misrepresentation of existing fact, including concealment, (2) upon which the other party justifiably relies, (3) to his injury, is estopped from denying his utterances or acts to the detriment of the other party." J. CALAMARI & J. PERILLO, CONTRACTS § 11–29(b), at 489 (3d ed.1987). Thus, the doctrine of equitable estoppel, when properly invoked, operates to preclude absolutely a party "from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy. . . ." *Martin v. Maine Central R.R. Co.,* 83 Me. 100, 104, 21 A. 740 (1890) (quotation omitted); *see Berry v. Board of Trustees,* 663 A.2d 14, 18 n. 8 (Me.1995) ("Estoppel bars the assertion of the truth by one whose misleading conduct has induced another to act to his detriment in reliance on what is untrue.") (quoting *Anderson v. Commissioner of Dep't of Human Servs.,* 489 A.2d 1094, 1099 (Me. 1985)). The doctrine of equitable estoppel is a principle of law, *see H.E. Sargent, Inc. v. Town of Wells,* 676 A.2d 920, 924 (Me.1996), and "should be carefully and sparingly applied," *Littlefield v. Adler,* 676 A.2d 940, 942 (Me.1996) (quotations omitted).

[¶ 26] L/A Auto Sales argues that CCC's unfulfilled alleged promise to "come up with a better finance package" should allow it to invoke the doctrine of equitable estoppel as a shield to prevent CCC from enforcing its loan agreements, and that the court's instructions were proper. We disagree. L/A Auto Sales fails to distinguish between the doctrine of promissory estoppel, which involves *promises* and *permits* enforcement of an otherwise unenforceable agreement, and the doctrine of equitable estoppel, which involves *misrepresentations* and *prevents* the assertion of an otherwise unequivocal right. *See Cottle Enters., Inc. v. Town of Farmington,* 693 A.2d 330, 335–36 n. 6 (Me.1997) (clarifying distinction between promissory and equitable estoppel). The doctrine of equitable estoppel, as distinguished from the doctrine of promissory es-

---

12. We note that the court's instructions described the types of conduct that could give rise to an equitable estoppel as "misrepresentations and misguided conduct." We assume that the court intended the phrase "misguided conduct" to mean "misleading conduct," or conduct which impliedly misrepresents the truth. *See* AMERICAN COLLEGE DICTIONARY 802 (2d college ed.1982) (defining "misguide" as "to give wrong or misleading directions; to lead astray").

toppel, ordinarily is used defensively and requires a misrepresentation as to a past or present fact. *See Chapman v. Bomann,* 381 A.2d 1123, 1127 (Me.1978) (estoppel in pais involves the misrepresentation of an existing fact). As a general rule, and apart from circumstances calling for application of the doctrine of promissory estoppel, "a representation or assurance, in order to furnish the basis of an estoppel, must relate to some present or past fact or state of things, as distinguished from mere promises or statements as to the future." 28 AM.JUR.2D *Estoppel and Waiver* § 46 (1966); *see* 31 C.J.S. *Estoppel* § 92 (1996) (where a party seeks to employ the affirmative defense of equitable estoppel based on another party's false representations, the doctrine is ordinarily applicable "only to representations as to facts either past or present, and not to representations or promises concerning the future"). In this case, CCC's alleged promise to provide a better financing package pertained to contemplated future action, and was not a false representation of past or present facts. Accordingly, we conclude that the requisites of an equitable estoppel are not present as a matter of law.

 [¶ 27] Moreover, even if CCC's alleged promise could be characterized as a "misrepresentation" for equitable estoppel purposes, we agree with CCC's contention that the court erred by instructing the jury that CCC could be estopped from enforcing *any* of its loan agreements "set forth during the course of the trial," regardless of when the loan funds were disbursed. Estoppel is used to prevent injustice and to promote justice, and should not be used to work a positive gain to a party. *See First State Bank v. Diamond Plastics Corp.,* 891 P.2d 1262, 1272 (Okla.1995). The record establishes that CCC had lent a substantial amount of money to L/A Auto Sales *before* its alleged promise to "come up with a better

finance package" in January 1990. Although L/A Auto Sales may have relied on CCC's alleged promise in its decision to decline the Fleet proposal, CCC's promise could not possibly have induced L/A Auto Sales to incur its already-existing indebtedness. A lender cannot be equitably estopped from enforcing the terms of loan agreements for loans that existed before, and therefore that were entered into without reliance upon, the alleged misrepresentation. *Cf., e.g., Rizk v. Jones,* 148 Ga.App. 473, 251 S.E.2d 360, 361 (1978) ("A lender's refusal to make a second loan, or even misrepresentations that it would make a second loan, does not bar the lender from recovery of the amount owed under the first loan."), *affd,* 243 Ga. 545, 255 S.E.2d 19 (1979).[13]

The entry is:

Judgments vacated. Remanded for further proceedings consistent with the opinion herein.

---

13. The principle underlying the doctrine of equitable estoppel supports this result:

[S]ince [equitable estoppel] operates as a shield and not as a sword, the estoppel should not be given effect beyond the extent of the injury or beyond what is necessary to accomplish justice between the parties, but should be limited to saving or making whole the person in whose favor it arises or, in other words, to what may be necessary *to put the parties in the same relative position which they would have occupied if the predicate of the estoppel had never existed.*
28 AM.JUR.2D § 34 *Estoppel and Waiver* (1996 & Supp.1997) (footnotes omitted) (emphasis added).