**Jeffrey B. GUTCHEON, et al.**

v.

**Jeffrey C. BECTON.**

Supreme Judicial Court of Maine.

Argued Oct. 30, 1990.
Decided Jan. 31, 1991.

William Silsby, Silsby & Silsby and Raymond Williams (orally), Ellsworth, for plaintiffs.

Nathaniel R. Fenton (orally), Fenton, Chapman, Fenton, Smith & Kane, Bar Harbor, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and BRODY, JJ.

GLASSMAN, Justice.

The defendant, Jeffrey Becton, appeals from the judgment entered by the Superior Court (Hancock County, *Beaulieu, J.*), which accepted and adopted the report of a referee finding that the plaintiffs,[1] Jeffrey B. Gutcheon, Martha M. Green, Sterling Douglas Steele and Geraldine Elaine Steele, Don P. Reiman and Gwen C. Reiman, Laurie A. Hayward and Clarence M. Hayward, and Cheryl Steele Morse and Terrell Morse, had acquired a right of way by prescription over Becton's property. Becton contends that the court erred in adopting the finding of the referee that such easements were created by prescription and were not currently overburdened, and in failing to describe the nature of the easements with sufficient particularity to prevent future overburdening. Finding no error, we affirm the judgment.

The focus of the present case is a one-lane dirt road (access road) that begins on a rural town road in Deer Isle, traverses in a southeasterly direction across property now owned by Becton, and terminates at the northern border of Lot 48D. (See diagram attached as Appendix "A" to this opinion). However, the access road is also the means of reaching eight other lots, 48, 48A, 48B, 48E, 48F, 49, and 49-1. The relevant facts regarding the past use of this access road can be briefly summarized: Beginning in 1932, Fountain and Celia Davis began to make successive purchases of the land located south of the current Becton property, comprised of land originally owned by Celia's father. They first acquired Lot 48D, located at the terminus of the access road, and began to use the road for vehicular access to their year-round residence which they had constructed on this lot. In 1935, the Davises acquired Lots 48E and 48F, located adjacent to Lot 48D to the east, and a small section of Lot 48, and continued to maintain and use this land in its undeveloped state as woodlots and pasture. In 1956 the Davises acquired the remainder of Lot 48, to the east of and adjacent to the three previously acquired lots, in its undeveloped state as woodland and pasture. Three years later, and prior to the Davises' acquisition of this lot, the Davises' daughter constructed a log cabin for seasonal use on Lot 48A, a small parcel south of Lot 48 reached by the access road and a driveway that the Davises had gradually extended from the terminus of the access road on Lot 48D to their other lots. In 1961, the Davises purchased Lot 48A and undeveloped Lots 48B, 48C, and

---

1. This proceeding was originally instituted by Arlene B. French and Arthur R. French, Jr., against Jeffrey C. Becton and Ernest H. Weiner, Jr., Becton's grantor. Ernest H. Weiner, Jr., was subsequently dismissed as a party. After Gutcheon acquired Lot 49-1 and Martha M. Green acquired Lot 49 from the Frenches, the court, with the agreement of the parties, ordered the substitution of Gutcheon and Green in place of the Frenches. Becton counterclaimed against Gutcheon and Green and amended the counterclaim to include the present owners of Lots 48, 48D, 48E, and 48F. For convenience of identification, we refer to the owners of these lots as the plaintiffs.

    Although there is some confusion in the record, it appears that Michael L. Kaiser and Marcia L. Gorman, husband and wife, are the present owners of Lot 48A (with an existing residence) and Lot 48B, on which a residence is being or has been constructed. They were named as parties in Becton's original counterclaim but voluntarily dismissed from this proceeding on June 29, 1987, approximately 15 months prior to the referral of the matter to the referee. Neither Larrabee nor Hardy, who had acquired Lot 48C from the Davises, nor Wainwright, to whom they subsequently deeded Lot 48C, were ever named as parties to this proceeding, although there is reference in the record that a residence is being or has been constructed on that lot.

    Accordingly, any prescriptive rights appurtenant to Lots 48A, 48B, and 48C are not at issue in this appeal.

49, all located to the south of Lot 48 and also reached by the access road and the extended driveway. The plaintiffs in the instant case all trace the titles to their respective lots as successors in interest to the Davises.[2] Other than Lots 48D and 48A, all of the other lots acquired through the Davises remained nonresidential in character until 1979.

In 1985, nine years after the purchase of his property, Becton recorded a notice, which he had previously posted at the intersection of the town and access roads, to prevent the acquisition of a right of way by the plaintiffs. *See* 14 M.R.S.A. § 812 (1980).[3] This notice was the first objection by Becton or any of his predecessors in title to the use of the road. The Frenches, then the current owners of Lot 49, brought the present action pursuant to 14 M.R.S.A. § 6654 (1980), claiming a prescriptive easement over the access road as ingress to Lot 49. Becton filed a counterclaim against all of the plaintiffs seeking a declaratory judgment as to the rights of the parties with respect to the access road. By agreement of the parties, the matter was referred to a referee. After a hearing, the referee found for the plaintiffs and issued his report stating, *inter alia:*

> [The plaintiffs are granted] an easement for vehicular traffic over the land of the defendant situated in Deer Isle, Hancock County, Maine. Said easement is located on a dirt road as now existing, which leads southerly from a road known as the French Camp Road through land of the defendant to land now owned by the plaintiffs, in that portion of Deer Isle known as Mountainville. The plaintiffs,

their heirs and assigns, have the right to maintain the road, but are obligated to keep it in its present rural state, being a single-lane dirt road with limited turn-out areas.

Becton filed objections to the report pursuant to M.R.Civ.P. 53(e). After a hearing on the objections, the court entered a judgment adopting the referee's report and Becton appeals.

▮▮▮ Becton first contends that the plaintiffs failed to establish a continuous use of the road for the requisite statutory period for the purpose of access to residential lots, and that the referee therefore erred in finding that prescriptive easements had been created over his land to benefit the plaintiffs' property in such a changed condition.[4] As with all the other elements of a prescriptive easement, we review the factual finding as to the element of continuity of use for clear error, *see Fitanides v. Holman,* 310 A.2d 65, 68 (Me. 1973), and will affirm a court's finding of fact if there is any competent evidence in the record to support it. *See Sheridan Corp. v. Silsby,* 410 A.2d 225, 227 (Me. 1980). *See also* M.R.Civ.P. 52(a) (Findings of referee to extent adopted by the court are considered as findings of court and shall not be set aside unless clearly erroneous. Due regard shall be given to opportunity of factfinder to judge credibility of witnesses). A prescriptive easement is established if the claimant can prove "a continuous use for at least twenty years under a claim of right adverse to the owner, with his knowledge and acquiescence, or by a use so open, notorious, visible and uninter-

2. In 1974 and 1975, Celia Davis conveyed Lots 48, 48D, 48E, and 48F to Geraldine and Sterling Steele. In 1979 the Steeles conveyed Lot 48D and the existing residence to Gary Steele and Cheryl Steele, and Lot 48E to Laurie Hayward and Clarence Hayward. The Haywards thereafter built a house on Lot 48E. In 1984, Geraldine and Sterling Steele conveyed Lot 48F to Cheryl Steele Morse and Terrell Morse, who then lived in a trailer on that parcel. In 1987, Gary Steele sold Lot 48D and the residence to Don and Gwen Reiman, and shortly thereafter Gary began construction of another house on Lot 48, owned by Geraldine and Sterling Steele. In 1969, the Davises sold present Lots 49 and 49–1 to Arthur and Arlene French, who later conveyed that property to Martha Green and Jeffrey Gutcheon in 1986. Green then began to construct a house on her lot.

3. Section 812 provides the manner of giving public notice of an intention by the owner of land to prevent the public or another person from acquiring a right of way or other easement by custom, use, or otherwise.

4. Becton concedes on appeal that there is an easement appurtenant to Lot 48D for residential purposes and that this easement is not currently overburdened.

rupted that knowledge and acquiescence will be presumed." *Town of Manchester v. Augusta Country Club*, 477 A.2d 1124, 1130 (Me.1984). Continuity of use may result from the "tacking" of successive periods of use when there is evidence of privity of title between successive users. *See Jost v. Resta*, 536 A.2d 1113, 1115 (Me.1988). The present record discloses that the Davises had acquired a prescriptive easement for vehicular traffic across the access road for ingress to Lot 48D in 1952, and to Lots 48E and 48F in 1955, and thereafter passed these rights of way by grant of these properties in 1974. An easement appurtenant to Lot 48 was acquired in 1976, since the plaintiffs Geraldine Steele and Sterling Steele, as successors in title to the Davises, could tack the nineteen years of prior use accumulated by the Davises. By similar tacking of the Davises' prior usage between 1961 and 1969, the Frenches acquired in 1981 an easement appurtenant to Lot 49 that was later divided into Lots 49 and 49–1 and passed to Green and Gutcheon as the respective grantees of those lots. In each case, the court properly found a continuity of use for the prescribed period of time and declared the creation of distinct easements appurtenant to each of the plaintiffs' lots. *See* G. Thompson, *2 Commentaries on the Modern Law of Real Property* § 349 (1980).

▪ Becton next contends that even if the court properly found the plaintiffs entitled to prescriptive easements, it erred in finding no current overburdening of the easements caused by the alleged increase in vehicular traffic across the access road, the plaintiffs' alleged interference with the established scope of the right of way, and the subsequent changes in the use of the various dominant estates from undeveloped to residential lots. Whether a prescriptive easement is overburdened is a question of fact, and we review the record to ascertain if there is competent evidence to support the factfinder's conclusions. In general, a person who possesses an easement over another's property can exercise his right only in a reasonable manner. *See Beckwith v. Rossi*, 157 Me. 532, 536, 175 A.2d 732, 735 (1962). Unlike an express ease-

ment, whose terms can usually be ascertained from the creating instrument, the permissible uses of an easement acquired by prescription are necessarily defined by the use of the servient land during the prescriptive period. *See MacKenna v. Town of Searsmont*, 349 A.2d 760, 672 (Me.1976). In order to remain useful to the dominant estate it serves, a prescriptive right of way must encompass some flexibility of use, and adapt to natural and foreseeable developments in the use of the surrounding land. When presented with an alleged overburdening of a prescriptive easement, the factfinder must balance the prior use of the right of way established during the prescriptive period against any later changes in the method of use that unreasonably or unforeseeably interfere with the enjoyment of the servient estate by its current owner. Contrary to Becton's contention, not all changes in the uses made of the dominant estate, such as the conversion of formerly undeveloped property to residential use, will result in a *per se* overburdening of a prescriptive right of way when the change does not manifest itself in some greater independent burden on the servient estate. *Parks v. Bishop*, 120 Mass. 340, 341 (1876).

▪ In the present case, the record discloses ample evidence that Becton's property has not been subjected to an unreasonable burden. The type of traffic across the right of way remains vehicular in nature. It is well settled that a mere increase in the volume of traffic across the access road will not constitute a *per se* overburdening. *See Baldwin v. Boston & Maine R.R.*, 181 Mass. 166, 169, 63 N.E. 428, 429 (1902). Becton testified that the access road is not visible from his residence. There was no evidence of a significant increase in the noise level and no evidence of other effluence normally associated with heavy traffic. Although there was conflicting evidence as to whether the plaintiffs had made physical alterations to and expanded the width of the right of way, thus interfering with Becton's enjoyment of his property, this factual dispute was resolved by the finding that the plain-

tiffs had neither widened the access road nor significantly altered its surface. The record supports the conclusion by the court that the change in character of Lots 48, 48E, 48F, 49, and 49–1 from nonresidential to residential properties does not currently create an unreasonable burden on the servient estate.

■ Becton finally contends that the description of the property rights acquired by the plaintiffs in the right of way over his property is too broad to protect him from potential future overburdening of the easements. In *Benner v. Sherman*, 371 A.2d 420 (Me.1977), we recognized that the scope of a prescriptive easement should be so limited as to prevent a clearly foreseeable overburdening, and we remanded the case to the trial court to ascertain the appropriate language of limitation. *Id.* at 422–23. In the instant case, however, the referee has effectively limited the easements by requiring that the Plaintiffs "are obligated to keep [the access road] in its present rural state, being a single-laned dirt road with limited turn-out areas." This restrictive language not only prevents any alteration of the present width of the access road, it also prevents any other physical alteration of it that would foreseeably lead to an overburdening of the easement or the placing of any new burden on the defendant's property. *See id.* 423.

The entry is:

Judgment affirmed.

ROBERTS, CLIFFORD and BRODY, JJ., concur.

APPENDIX A

GUTCHEON v. BECTON

HAN-90-223

WATHEN, Justice, with whom McKUSICK, C.J., joins, dissenting.

I must respectfully dissent. The Court's analysis is flawed. This is not simply a case in which the owner of the dominant estate establishes a prescriptive easement for residential access and then subdivides the dominant estate. In such circumstances it is appropriate to apportion the easement among the portions of the lot to which the easement is appurtenant, provided that the servient estate is not unreasonably burdened. The present case is more complicated. The Davises first acquired a single parcel of land with a residence and, in 1932, began to use the servient estate to gain access. In 1935 and 1956, they acquired five parcels of adjoining land from two different grantors which they used as field and pasture. In 1961, they acquired additional parcels of land from another grantor. Although this land adjoins the expanded parcel, it had not previously been served by the easement. All of the lots at issue remained non-residential until 1979.

The Court correctly finds twenty years of continuous use with reference to all parcels by tacking on the prior usage of the Davises. It errs, however, in failing to consider that the nature of the easement appurtenant to each lot is determined by the use of the easement made by the Davises and their successors during their period of ownership for the benefit of that particular lot. Use of the easement to provide access to a residence on one lot does not establish a similar easement for a lot purchased at a later time and used as a pasture. The issue is not, as the Court suggests, whether the easement for access to residences is per se overburdened by converting pastures to residential property. The appropriate inquiry is the scope of the prescriptive easements appurtenant to the parcels used for agricultural purposes.

"The extent of an easement created by prescription is fixed by the use through which it was created." Restatement of Property, § 477. Although some variation is inevitable, the use made under a prescriptive easement must either be consistent with the general pattern of use that gave rise to the creation of the easement or result from the normal evolution of that use. *Id.* §§ 478–479. In *Benner v. Sherman,* 371 A.2d 420 (Me.1977), we applied the Restatement principles and held that the use of land for general recreational purposes did not create an easement broad enough in scope to include access for shore front cottages. *Id.* at 423. In the present case, I conclude that a prescriptive easement obtained for access to a dominant parcel of land used for agricultural purposes does not include access to residences placed on the parcel at a later point. The residential use is not consistent with the general pattern of agricultural use that served as the basis for the easement nor has it evolved from that use. See Annotation, *Scope of Prescriptive Easement for Access,* 79 A.L.R.4th 604, 627 (1990) for cases from other jurisdictions supporting this view. With the exception of lot 48D and lot 48A, I would vacate the judgment of the Superior Court and remand for a declaration of prescriptive rights consistent with the agricultural use that gave rise to those rights.