2002 ME 130

**Milton E. BRAY**

v.

**David M. GRINDLE.**

Supreme Judicial Court of Maine.

Submitted on Briefs: April 18, 2002.
Decided: Aug. 8, 2002.

Ellen S. Best, Blue Hill, for the plaintiff.

Christopher J. Whalley, Ellsworth, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] David Grindle appeals from a judgment entered after a bench trial in Superior Court (Hancock County, *Marsano, J.*), declaring the scope of Grindle's easement across the land of Milton Bray and awarding Bray statutory trespass damages and attorney fees. Because the trial court awarded excessive attorney fees and imposed more limitations on Grindle's easement than the evidence permitted, we modify the judgment.

## I. BACKGROUND

[¶ 2] Bray and Grindle own adjoining parcels of land on Deer Isle. Bray's land, which has been in his family since the 1860s, fronts on Route 15. Bray has had an interest in the property since 1987, has been sole owner since 1999, and has lived there since December 2000. Grindle's land does not abut a public road. It was bought by his grandfather in 1927, deeded to his father in 1947, and deeded to him in 1985. Since at least the 1930s, the Grindles used an old woods road across Bray's property (the road) as the sole way to access their land from Route 15. Several witnesses agreed that the road was about

eight to ten feet wide, with trees right up to its edge. It had some very swampy stretches, so that it was passable by truck only during winter or a dry summer, and at other times only by tractor or jitterbug (a primitive, homemade skidder).

[¶ 3] No one lived on the Grindle property after the mid-nineteenth century. The gravestone of one of the last residents is dated 1832. The Grindles used the land primarily as a wood lot, commercially until the 1950s and for firewood thereafter. They also cut hay, picked berries, and "winter[ed] over a cow or maybe two." Grindle's father testified that the family used the land approximately four or five times per month.

[¶ 4] In 1995, the Dunham heirs, owners of a lot abutting Bray's and Grindle's land, hired Martin Larsen to cut wood on their property. In three months he cut a large amount of wood and, using a skidder, dragged it out the road to Route 15. The ground was wet and Larsen seriously damaged the road, leaving it muddy, deeply rutted, and impassable. The parties disputed whether Larsen also widened the road at its swampiest point in trying to drive over drier ground.

[¶ 5] In 1996, without consulting Bray, Grindle hired Franklin Sand & Gravel to repair the road. At a cost of $7500, plus $750 that Grindle paid for culverts, Franklin bulldozed and laid gravel along the length of the road, turning it into a dry, all-weather driveway. Some trees were cut and the road was widened; how many and to what extent were disputed at trial. Also disputed was whether the new driveway was moved to higher, drier ground than the old road in the swampy section. In 1997 Grindle began building a house on his land. In late 1997, Bray wrote to Grindle asking by what right he was working on the road, but not demanding that he stop. Grindle responded by referring to his deed, which like his father's and grandfather's deeds made mention of a right-of-way.

[¶ 6] Bray filed a complaint against Grindle in 1999, seeking statutory trespass damages and a judgment declaring that Grindle has no right-of-way across Bray's land. The court entered a standard-form scheduling order pursuant to M.R. Civ. P. 16(a), requiring Bray to file within three months an expert witness designation including "a complete statement of the information and reports required by M.R. Civ. P. 26(b)(4)(A)(i)." Bray never filed an expert witness designation.

[¶ 7] At the one-day trial, Bray called forester David Warren as his third witness, to provide expert testimony on the damage to Bray's property. Grindle objected on the grounds that Bray had never formally designated Warren as an expert and that he had disclosed Warren's report to Grindle only two business days before trial. Bray argued that Grindle had notice "from the beginning" of the case that Warren would be Bray's expert and would be reviewing the property, which Grindle's attorney admitted was true. Grindle argued that the figures contained in Warren's report were far higher than he had expected and that he had not had an opportunity to get his own expert forester to refute them. The trial court overruled the objection and allowed Warren to testify, although Bray agreed he would not introduce Warren's report. Warren testified at length on the extent of the damage, stating that the average tree-to-tree width of the road was now forty feet; that he counted 468 stumps with a forfeiture value pursuant to 17 M.R.S.A. § 2510 (1983 & Supp. 2001) of $15,925; and that cleaning up and restoring trees along the length of the road would cost $4252. Grindle repeatedly objected to this testimony, contending that all of these facts came from Warren's report and that he was just reading from it. The court overruled the objections, stating

that Warren was entitled to testify from his recorded recollection and that the understanding between counsel that Warren would be Bray's expert was sufficient to comply with the pretrial order.

[¶ 8] The court heard testimony from several other witnesses including woodcutter Martin Larsen, Bray, Grindle, and Grindle's father, Milton Grindle. After receiving written closing arguments the court entered judgment, concluding that Grindle had not intentionally damaged the road and had not intentionally cut Bray's trees, because he was acting under an erroneous belief that he had a deeded right-of-way; that pursuant to 14 M.R.S.A. § 7552 (Supp.2001) Bray was entitled to $5000 damages for the cut trees plus costs and $3296.61 in attorney fees; that Grindle does not have a deeded easement across Bray's land; that Grindle has a prescriptive easement across Bray's land for purposes of intermittent logging and berrying, limited to thirty times per year; that Bray can enforce those limits with a locked gate, with access for Grindle only on written notice to Bray unless the parties agree otherwise; and that Grindle does not have an easement for utilities. Grindle then brought this appeal.

## II. EXPERT WITNESS

■ [¶ 9] Grindle argues that the trial court should have excluded Warren's testimony as a sanction for Bray's failure to file an expert witness designation and to disclose the substance of Warren's opinion until the eve of trial. We have twice found an abuse of discretion when a trial court allowed expert testimony despite the failure to designate the expert. *Chrysler Credit Corp. v. Bert Cote's L/A Auto Sales, Inc.,* 1998 ME 53, ¶ 23, 707 A.2d 1311, 1317–18; *Spickler v. York,* 566 A.2d 1385,

1388 (Me.1989) (per curiam). These cases are distinguishable, however, because the opposing parties there were completely surprised by the expert testimony in a way that Grindle was not. *See Chrysler Credit,* 1998 ME 53, ¶ 23, 707 A.2d at 1317 (plaintiff did not know until defendant's witness testified that he would be an expert, not just a fact witness); *Spickler,* 566 A.2d at 1388 (plaintiff did not designate expert until fourth day of trial). Although Bray did not file a formal expert designation, Grindle's attorney knew long before trial that Bray had hired Warren as his expert. Although the court would have been acting within its discretion had it excluded Warren's testimony, given the fact that Grindle was not unfairly surprised, the court was not required to exclude Warren's expert testimony.

■ [¶ 10] Grindle argues that the court should at least have granted a continuance, but he never asked for one. *See Pettitt v. Lizotte,* 454 A.2d 329, 332–33 (Me.1982) (finding no abuse of discretion in allowing defendant's surprise fact witness to testify when plaintiff did not request continuance); *see also Spickler,* 566 A.2d at 1388 n. 1 (noting that continuance is usual remedy for unfair surprise). The court did not abuse its discretion in allowing Warren to testify and to read from his report and in considering his testimony in determining the amount of damages.

## III. DAMAGES AND ATTORNEY FEES

[¶ 11] Pursuant to the timber trespass statute, 14 M.R.S.A. § 7552, the trial court awarded Bray $5000 in damages and $3296.61 in attorney fees, plus costs. Contrary to Grindle's contention, the damage award is amply supported by the record and is not clearly erroneous.[1]

---

1. Indeed, if the court had accepted Warren's testimony in its entirety, the statute would likely have permitted it to award substantially greater damages, *see* 14 M.R.S.A. § 7552(3)(B), (4)(A) (damages may include forfeiture for cut trees pursuant to 17

[¶ 12] Grindle also challenges the attorney fee award, noting that under section 7552(5), "[t]he amount awarded for professional services may not exceed 50% percent of the damages recovered pursuant to subsection 4 plus interest on the damages." The court exceeded the limitation in this provision by awarding $5000 in damages, with no prejudgment interest, and $3296.61 in attorney fees. The attorney fee award must therefore be reduced to $2500.[2]

## IV. PRESCRIPTIVE EASEMENT

■ [¶ 13] The trial court found that the Grindles' use of the road during the prescriptive period was limited to intermittent logging and berrying. Although Grindle attempts an argument to the contrary, that finding is supported by the record. The testimony of Grindle's father as to other uses in the years before World War II, including use as a cow pasture and hayfields, does not compel a finding of such uses throughout the prescriptive period.

[¶ 14] The court also concluded that Grindle's easement is limited to the same use, intermittent logging and berrying. The court relied on the general rule that "an easement acquired by prescription is limited by the character of the prescriptive use." *MacKenna v. Inhabitants of the Town of Searsmont,* 349 A.2d 760, 762 (Me.1976); *see also* RESTATEMENT OF PROPERTY § 477 (1944) ("The extent of an easement created by prescription is fixed by the use through which it was created.").

■ [¶ 15] The rule is more complicated than that simple statement suggests, however. "Since no use can ever be exactly duplicated, some variation between the use by which a prescriptive easement was created and the uses made under it after its

creation is inevitable. The problem is to ascertain the limits of permissible variation." RESTATEMENT § 478 cmt. a. The Restatement, which is consistent with our caselaw, adopts a multi-factor test:

> In ascertaining whether a particular use is permissible under an easement created by prescription a comparison must be made between such use and the use by which the easement was created with respect to
>
> (a) their physical character,
>
> (b) their purpose, [and]
>
> (c) the relative burden caused by them upon the servient tenement.

RESTATEMENT § 478, *cited in Pace v. Carter,* 390 A.2d 505, 508 (Me.1978). The general principle underlying these factors is that "a use made under a prescriptive easement must be consistent with the general pattern formed by the use by which the easement was created." RESTATEMENT § 478 cmt. a.

[¶ 16] An additional factor is relevant in cases like this one:

> In ascertaining whether a particular use is permissible under an easement appurtenant created by prescription there must be considered, in addition to the factors enumerated in § 478, the needs which result from a normal evolution in the use of the dominant tenement and the extent to which the satisfaction of those needs increases the burden on the servient tenement.

RESTATEMENT § 479. This factor accords with our holding in *Gutcheon v. Becton,* 585 A.2d 818, 822 (Me.1991), that "[i]n order to remain useful to the dominant estate it serves, a prescriptive right of way must encompass some flexibility of use,

---

M.R.S.A. § 2510 plus costs of regeneration, doubled if violation is negligent or without fault), but we need not decide this because Bray has not cross-appealed.

**2.** Grindle's other arguments concerning the award of damages, fees, and costs do not merit discussion.

and adapt to natural and foreseeable developments in the use of the surrounding land."

[¶ 17] In *Gutcheon,* the plaintiffs accessed their six respective lots on Deer Isle, and nonparties accessed three adjoining lots, by a road over the defendant's land. During the prescriptive period there was a residence on one of the six lots and a summer cottage on one of the nonparty lots; the rest of the dominant parcels remained undeveloped woodlots and pasture. We affirmed a finding that the plaintiffs' prescriptive easements included the right to access all of their lots for residential purposes, holding that

> not all changes in the uses made of the dominant estate, such as the conversion of formerly undeveloped property to residential use, will result in a *per se* overburdening of a prescriptive right of way when the change does not manifest itself in some greater independent burden on the servient estate.

*Id.* at 822. Since the defendant could not see the road from his house and there was no evidence that increased traffic would cause significant noise or other problems, the use of the road for residential purposes was a "natural and foreseeable development[ ]" that did not "unreasonably or unforeseeably interfere with the enjoyment of the servient estate." *Id.*

[¶ 18] Here, the trial court made no explicit findings on whether any uses by Grindle in addition to intermittent logging and berrying would be permissible under *Gutcheon* and sections 478 and 479 of the Restatement. In limiting Grindle's easement to intermittent logging and berrying, the court presumably made an implicit finding that no additional uses would be permissible. The evidence presented at trial, however, was insufficient for the court to find for either party on this issue. That evidence focused on the use of the road during the prescriptive period and

the damage caused by Grindle's 1996 improvement of the road, rather than on the future use proposed by Grindle and the effect of such use on Bray. From Grindle's testimony that he was building a house on his property, did not presently intend to run utilities to it, and owned and resided in another house on Deer Isle, it is impossible to determine whether he sought to use the road to access the new house on a year-round, daily basis or only seasonally or intermittently. It follows that there was insufficient evidence to decide whether increased use by Grindle would be a natural and foreseeable development and whether it would unreasonably burden the enjoyment of the servient tenement by Bray, who testified that he could not see the road from his house but could hear vehicles on it.

[¶ 19] Based on its finding of the use during the prescriptive period, the trial court correctly declared that Grindle has an easement across Bray's land for intermittent logging and berrying. On this record, however, the court should have declined to go beyond that basic declaration. *Cf. Markley v. Semle,* 1998 ME 145, ¶ 20, 713 A.2d 945, 950 (affirming trial court's refusal to declare boundary because of insufficient evidence). We therefore modify the judgment to remove the declaration that Grindle's prescriptive easement is *limited* to intermittent logging and berrying. We also remove the declaration that Grindle has no easement for utilities; although Grindle testified that his land had never had electric power and he could not afford to install it, the issue of utilities is so bound up with the question of whether Grindle has an easement for residential use that it should not be decided separately.

■ [¶ 20] Finally, because Grindle may have an easement of greater scope than just intermittent logging and berrying, we

modify the judgment to remove the provisions that limit his use to thirty visits per year, allow Bray to erect a locked gate, and require Grindle to give written notice before using the road. We need not decide whether such provisions might be warranted if a court in a future action finds limits on the scope of Grindle's easement. *But cf. Gutcheon,* 585 A.2d at 822 ("It is well settled that a mere increase in the volume of traffic across the access road will not constitute a *per se* overburdening."). Nothing prevents either party from bringing such a new action because a declaratory judgment has preclusive effect in a subsequent action only as to the matters actually declared. *Markley,* 1998 ME 145, ¶¶ 22–23, 713 A.2d at 951 (Dana, J., concurring); RESTATEMENT (SECOND) OF JUDGMENTS § 33 (1982).

The entry is:

Judgment modified to reduce attorney fee award to $2500 and to declare that defendant Grindle has a prescriptive easement across the land of plaintiff Bray for purposes of intermittent logging and berrying and, as so modified, affirmed.